**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | | **CRIMINAL NOs.  14-496** |
| v. | : | **14-516** |
| | | |
| **NATHANIEL DA-MEIR COLES** | : | |
| a/k/a "Daz" | | |
| a/ka "D" | : | |
| a/k/a "Big Bat" | | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The government, by and through its attorneys, William M. McSwain, United States

Attorney, and Robert E. Eckert, Assistant United States Attorney, submit this memorandum to

assist the Court in the sentencing of defendant Nathanial Da-Meir Coles, in the hearing that is

scheduled for Friday, June 21, 2019 at 10:00 a.m.

**I.      INTRODUCTION**

   **A.      Procedural Background**

<u>**Criminal No. 14-496**</u>

On September 17, 2014, a federal grand jury returned a one-count indictment charging

him, Donald Womack, Sr., Nathaniel Coles, and Michael Pinkney with conspiracy to possess

with the intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846.

On February 16, 2017, after a five-day trial, a jury unanimously convicted defendants

Paris Church, Donald Womack, and Nathaniel Coles, of the sole count of the indictment,

conspiracy to possess with the intent to distribute five kilograms or more of cocaine, in

violation of 21 U.S.C . § 846.

**Criminal No. 14-516**

On September 25, 2014, a federal grand jury returned an Indictment charging defendant Coles, along with William Dorsey and Donald Womack with one count of conspiracy to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(B); and six counts of unlawful use of a communication facility in furtherance of a drug felony, in violation of 21 U.S.C. § 843(b)

On November 28, 2018, defendant Coles plead guilty to the indictment in accordance with a guilty plea agreement made under Fed. R. Crim. Proc. 11(c)(1)(C).

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.
>
> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006).

In calculating the guideline range, this Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the *Booker* decision. *United States v. Grier*, 475 F.3d 556 (3d

Cir. 2007) (en banc). The failure to properly calculate the advisory guideline range will rarely be harmless error. *United States v. Langford*, 516 F.3d 205, 214-18 (3d Cir. 2008).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority."); *United States v. Flores-Mejia*, -- F.3d --, 2014 WL 3450938, *2 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors, which support a sentence within the guideline range of 360 months' imprisonment in 14-CR-496 and a sentence of 120 months in 14-CR-516 to run concurrently to the sentence imposed in 14-CR-496.

## II.    FACTUAL BACKGROUND

### Criminal No. 14-496

From in or about January 2014 to in or about February 2014, defendant Donald Womack and co-defendants, Michael Pinkney, Nathaniel Coles, and Paris Church, conspired to obtain 18

to 20 kilograms of cocaine from a source of supply in Mexico ("Daniel"). This source of supply ("Daniel") was obtained through a connection of defendant Womack. In consideration for this deal, the defendants sent money down to an address in Mexico given to them by "Daniel." However, the transaction was not completed.

The evidence of this drug trafficking crime was obtained through intercepted communications between the co-defendants and with "Daniel" during the course of a court-authorized wiretap investigation conducted by the Drug Enforcement Administration ("DEA") and Federal Bureau of Investigation ("FBI").

Calls specifically presented to the jury were as follows:

**January 27, 2014**

Sessions 5562, 5566, 5571, 5584, 5588, 5592, 5600, 5601, 5602, 5613, 5616, 5617, 5621, 5628, 5629, 5632, 5633, 5643, 5646, 5647, 5659, 6404:  Calls and text messages between Church, Womack, Pinkney, Coles, and "Daniel," (the Mexican source of supply) arranging for Church to get from approximately 18 kilograms of cocaine.  They arranged for Pinkney to assist Church in going to Texas to pick the cocaine up. Co-defendant Coles assisted Church and defendant Womack  by communicating with "Daniel" through text messages.

These communications began when defendant Womack sent a Mexican number to Church and told him (Church) to tell "Daniel" that Church was Womack's cousin.  In numerous phone calls, defendant Womack and co-defendant Church try to reach "Daniel."  In the meantime, Church also talks to co-defendant Pinkney about checking out an RV store in order to rent an RV for them to drive to Texas to get the kilograms of cocaine from "Daniel," which "Daniel" would send via car from Mexico.  Pinkney testified at trial that they reached out to "Daniel" because the area has "dry (out of cocaine supply) for a while.

In calls, Church and "Daniel" discussed Church coming to Houston to pick up the cocaine and how "Daniel" needed to get them over the Mexican border with a car. Church told "Daniel" that he knew how to send it back to Pennsylvania from Texas. "Daniel" tells Church that he needs to have a little money to get his guy (the courier) to come over the border. "Daniel" also informs Church that he has "30 pieces" (meaning 30 kilograms of cocaine) and "the owner got eighty pieces down south in Mexico," (meaning 80 kilograms of cocaine), but he needs cash to make the deal happen. "Daniel" tells Church that he can send a car with 18 to 20 "pieces" (kilograms) to Houston for Church. Church assures Daniel that they will take delivery in Houston and send full payment back in the same vehicle that the drugs are delivered in. "Daniel" also discusses texting with Womack's other cousin, meaning Nathaniel Coles. Church tells "Daniel" that he is Womack's other cousin and he (Church) "will do all the travelling for him (Womack)." Church asked Pinkney to go to Mexico with him, and Church and Coles discussed getting in touch with "Daniel" to make sure he calls Church when he is ready to meet in Houston for the transaction.

**January 29, 2014 – January 30, 2014**

Sessions 5859, 5875, 5893, 5897, 5904, 5942, 5956, 5958, 5963, 5968, 5971, 6100: In these calls between the defendants and with "Daniel," the defendants continued to discuss shipping kilograms from Mexico via Houston. At "Daniel's" direction, Paris Church sends "Daniel" the requested $300 for "Daniel's" drug courier via *Western Union*, in the name of Mario Castandea in Kingsville, Texas. "Daniel" gives the name of Castanedo to Church sends the money using the name, "Dereck Davis."

Defendant Womck, Paris Church, and Nathaniel Coles discussed trying to get in touch with "Daniel." Church speaks to "Daniel" throughout the deal. "Daniel" coordinated with

Womack, Coles, and Church. Church offers to go to Houston that day. "Daniel" told Church that if he wired the money, they would get the car over the border by the next day. Church continues to update Womack as to the plans being made with "Daniel" and the money sent via *Western Union*.

"Daniel" informs Paris Church via voicemail that he spelled the driver's name wrong. "Daniel" gives the correct spelling of the last name, "Castenada." Church returned to *Western Union* and corrected the spelling so the money can be released to the drug courier.

Co-defendant Pinkney continued to be ready to go with Church to Texas whenever Church called to say that the drugs were ready. In phone calls with Church, Pinkney discussed that he had explored the price of renting an RV to drive to Texas. Church and Pinkney discuss how to drive to Texas without getting pulled over by law enforcement.

At trial, DEA Special Agent, Patrick Barry testified to obtaining *Western Union* records detailing the wire transfer of $300 by Paris Church, using the name Dereck Davis, to Mario Castanada, as well records showing Church returning to *Western Union* to correct the spelling of the recipient as instructed by "Daniel." In addition, Special Agent Barry obtained *Western Union* surveillance footage of Church at the customer service counter on both occasions.

## January 31, 2014 – February 4, 2014

Sessions 6196, 6217, 6225, 6451, 6572, 6660, 6864: In these calls, Paris Church, Michael Pinkney and "Daniel" further discussed the drug transaction. "Daniel" told Church that he almost had the car ready to cross the Mexican border that day. Church called Pinkney to tell him that "Daniel" said that the drug courier would cross that day. Pinkney called Church to say he was at Church's house. After several hours, Church called Pinkney to say he had not heard anything from "Daniel." Church called Pinkney to say that he saw a text to "the boy," (meaning co-

defendant Nathaniel Coles), to say that "Daniel" texted the night before stating that he would be in Houston that day. The next day, Church told Pinkney that neither he nor "the bull," (meaning co-defendant Coles), had heard from him. Co-defendant Pinkney thinks "Daniel" is going to be a "no-show," and tells Church that he is trying to get enough money to leave town to find another source of supply. Church told Pinkney that someone definitely got some and Pinkney says he didn't know why that person didn't call him.

In coordination with the calls, DEA agents surveilled Pinkney meeting at Church's home as the intercepted call indicated.

**February 1, 2014 – February 4, 2014**

Sessions 6410, 6416, 6434, 6447, 6579, 6654, 6655, 6768, 6769, 6771: Calls between Church, Womack and Coles in which Church asks Womack to have Coles to try contact "Daniel" Womack says that "Daz" did do it (referring to co-defendant Coles). After several calls, Church spoke to Coles, saying that he wrote "Daniel" but that he never heard back.

**February 5, 2014**

In Session 6977: Church and Coles discussed whether the deal with "Daniel" was legitimate and whether "Daniel" stole their $300.

**February 20, 2014**

Session 9251 is a call between Church and Womack in which Church asks if Coles had ever heard from "Daniel." Womack replies, "No, no, hell no." Church: "[they] f---d me." Womack: "Yeah, yeah… I tried to tell you. I told you." CHURCH: "You damn sure did."

**Criminal No. 14-496**

From on or about November 20, 2013, through on or about January 15, 2014, in Chester, Pennsylvania, defendant NATHANIEL COLES conspired with co-defendants Donald Womack

and William Dorsey to distribute 500 grams or more of cocaine in the Chester, Pennsylvania area. Phone calls intercepted during a court-authorized Title III wiretap investigation of the phone of William Dorsey, revealed extensive conversations with COLES, regarding the purchasing, pricing and method of distributing cocaine. Dorsey discussed with COLES the 250-gram quantities of cocaine he (Dorsey) was obtaining from his supplier, Paris Church (charged elsewhere). On some occasions, COLES assisted Dorsey in securing customers to purchase cocaine from Dorsey. Dorsey supplied COLES with cocaine and/offered to supply him with cocaine for the purpose of re-distribution. Womack also supplied COLES with cocaine and at times, arranged for DORSEY to give 125 grams of cocaine to COLES to distribute to one of Womack's customers.

Dorsey counseled COLES on how to handle his cocaine business, and discussed with Womack the fact that COLES was not listening to him. In one instance, COLES asked Dorsey to accompany him with a gun to make a drug sale because COLES was worried about his safety in the area where transaction was set to occur. Dorsey admonished COLES that he should only engage in drug sales in their territory.

The wiretap evidence is as follows:

**November 20, 2013**

On November 20, 2013, defendant COLES calls Dorsey to talk about cocaine suppliers.

**Summary of Call:** COLES told Dorsey that he was trying to buy cocaine from a certain supplier. COLES said someone, "filled me in on the situation, but that situation crazy though." DORSEY said, "Yeah, that's out of the way man, that ain't nothing. That ain't nothing to shout about." COLES replied, "Yeah, yeah, yeah. Yeah, yeah, that situation is super crazy. You know what I'm saying….Like (U/I) the only thing we gonna be able to get over on is ah, a trey, the

8

trey 50, you know what I'm saying, if that?" (*Meaning they will only be able to make at most $350 off of selling likely cocaine that is being offered to them at a high price*.) DORSEY responded, "Yeah, but then we gotta get everybody bread and all that ol extra shit man, and it's dust." (*Meaning they have to give some of that money to others and the cocaine won't even be of a good quality*.) COLES said, "…that's too accurate because at the end of the day, people don't really be trying to trust m—rf---rs with, with, with, with their coin, so, you know what I mean?" (Meaning their people won't trust the supplier with their money.) Dorsey and COLES continued to discuss that the cocaine they were being supplied was "dust" (*of poor quality*), but COLES said he could sell it even if it is dust. COLES told Dorsey, "….if, if I can get it in my hands, I can be able to make it work." Dorsey replied, "Yeah…that's the only thing, but…Anybody can, can told you that too, I'd, you know I'd drop it, do whatever..." (*Meaning that DORSEY could cook it into crack cocaine*) DORSEY said that he wasn't going to do the deal being offered because it was only for 250 grams of cocaine, and he risked being arrested when he said, "Running point sales come up 250, but jeopardizing my freedom every time." COLES replied, "Yeah, exactly, exactly!" COLES returned to trying to connect with the supplier he originally was speaking about saying he was counting on getting cocaine from him: "I'm banking on that situation. That situation come through man we be good."

## November 21, 2013

On November 21, 2013, Dorsey called COLES to see if he wanted cocaine DORSEY just picked up. COLES declined.

**Summary of Call:** Dorsey told COLES, "I've got some singles that might go for a stizzie *(ounces of cocaine for $1000)* …some singles for a stizzie." COLES responded, "I'm getting ready do the same situation you do."

9

**November 21, 2013**

On November 21, 2013, COLES and Dorsey discussed Dorsey being finished distributing cocaine for the day. Dorsey said he sold most of the two "points" (two 125-gram quantities) he got from his supplier, Paris Church (charged elsewhere). Dorsey explained that he was selling ounces of cocaine for $1,000, to get rid of them quickly so he could show Church that he could move cocaine. COLES said he would start sending customers to Dorsey.

**Summary of Call(s):** COLES told Dorsey he was, "waiting on 'Old Head' (*COLES' nickname for Donald Womack*) to call me . . . so I can ah get my situation on." (*COLES was waiting on Womack to call him so COLES can get cocaine from him and start dealing again*). COLES said if Womack did not come through with the cocaine, he would send his customers to Dorsey. COLES said, "Well, if I don't get, if I don't get my situation today, then whatever hit me I'll just send it your way." DORSEY replied, "Yeah, I'm almost done though…I had got rid of like two of 'em. But I'm, I'm damn near done." (*Meaning he had gotten rid of two ounces that day and was almost out of cocaine to sell.*) COLES asked why Dorsey was selling the cocaine for $1000 per ounce when he asked, "Why the hell you going on a stack though?" Dorsey replied, "I got my reasons man." COLES asked, "Oh, you trying to get everybody out of the way?" (*Asking if Dorsey was trying to beat out other drug dealers on price so customers come to him*) Dorsey said he was trying to do that, but also trying to build a relationship with Church as his supplier. Dorsey said, "I'm trying to do that, do that. I'm trying to lock shit in, and I'm trying m---rf---n build a relationship." COLES responded that he thought so because he couldn't understand why Dorsey would do that when it meant Dorsey wasn't going to make any money off of the sales: "Yeah, cause I was like g-dd--n, I was like, at that number, I was like, he ain't, I'm thinking in my head, he ain't really gonna make no money." Dorsey said, "It ain't about that all the time."

Dorsey said he was not going to buy "dust" *(poor quality cocaine).* COLES said that, "Old Head (Womack) said it was pebbles in it too though." (*Meaning the cocaine Womack was going to get for COLES had some chunks of cocaine in it that would appear to be of higher quality*.) Dorsey said that there weren't chunks in it and that, "…it was dust. I mean, you could tell by the work through, what type of gear it was….that's why he wasn't going to go for that and wanted to be ready when, "a slizzab *(good quality cocaine)* come through . . . I'm first to come to mind." Dorsey went on to say that he is going to make his money, "on that slide," (*meaning with the higher quality cocaine*). COLES agreed when he said, "Yeah, exactly, exactly. Then you could shoot up to like 12 and all that shit." (*Meaning then Dorsey could charge $1,200 per ounce*). Dorsey replied, "Yeah, yeah, no doubt. I'm all over it. I'm all over it boy."

## November 21, 2013

On November 21, 2013, Dorsey told COLES that someone had just grabbed half a kilogram of cocaine from XXX (a drug supplier known to law enforcement). COLES and Dorsey discussed the price, and agree to meet later.

**Summary of Call(s):** COLES asked Dorsey if he had heard anything else from a drug supplier. Dorsey said he thought somebody had just been supplied with a half-kilogram of cocaine by "him" *(the supplier).* COLES made sure Dorsey wasn't talking about half an ounce of cocaine, and asked, "Half a joint?" Dorsey replied, "Yeah. What else you talking about?" COLES said, "Nah, I thought you might be talking 'bout half a single." Dorsey replied, "Come on man!" COLES asked how much the supplier charged. Dorsey replied, "…like 17, 17, 18.5, 17.5, some, I forget, 18" (*meaning $17,000 to $18,000, the approximate price for a half kilogram of cocaine*). COLES asked Dorsey why the supplier had not sold to Dorsey previously. Dorsey said he was not concerned. COLES agreed and said, "Yeah man I, I feel yah, I, I can't wait though

man, you gonna shut, shut this s--t down man," (*Meaning DORSEY is going to do well as a supplier when things come through for him.*)

**November 22, 2013**

On November 22, 2013, Dorsey and COLES discussed Dorsey wanting to sell two quantities of cocaine quickly to impress his supplier, Paris Church, and COLES trying to move 125 grams of cocaine.

**Summary of Call(s):**  Dorsey called COLES and said, ". . .  I need, I need, I need two single joints."  COLES said, "Ah, somebody just hit me, somebody just hit me for a . . .  what's his name . . .  for a "49er" (*coded language for 125 grams of cocaine*) man, know what I'm saying, I'm waiting for 'Old Head' (Womack) to put that together, but the single jauns come through already know a I'm a send it."  COLES later said, "Ah the 'Old Head,' I talked to ah 'Kas' (Womack)."  Dorsey explained, "I like I gotta try I'm a try to sell these two singles real quick . . . . so that way I can a  . . . you know what I mean we can be on point so when he call me I can be like, 'yeah I'm ready' you know what I mean?"  (*Meaning Dorsey wants to sell his cocaine quickly so that when Church calls, he is ready to get more cocaine.*)  COLES ultimately said he was going to check on what was happening with the point of cocaine, and afterward he was going to get back to Dorsey.

**November 22, 2013**

On November 22, 2013, COLES called Dorsey to tell him that he had a customer for Dorsey's two ounces of cocaine.

**Summary of Call(s):**  COLES asked if DORSEY had already sold the two ounces of cocaine when he asked, "Hey yo, you ahh, you still got them two situations, right?"  DORSEY replied,

"Yeah." COLES said he was going to call someone who might want to buy them, when he said, "Alright, I'm ready to ahh, to make a phone call for you." Dorsey replied, "Alright."

**November 22, 2013**

On November 22, 2013, Dorsey called COLES and said that he only had an ounce of cocaine left. COLES said he needed Womack to come through with cocaine for him and that he was trying to get 250 grams of cocaine for customers he had lined up. Dorsey is going to call his supplier (Paris Church) for more cocaine as soon as he gets rid of what he still has.

**Summary of Call(s):** DORSEY told COLES that he only had an ounce and a half left: "It's a single and a hizzie left." COLES said not to worry because no one had called him back yet about buying them. Dorsey said, "Alright, nah, I was just telling you so you won't think it was two left." COLES repeated what he had said in the previous call about needing Womack to "come through." Dorsey asked what Womack was saying and COLES said that Womack said that his supplier hadn't called him back yet. COLES said that he had customers waiting. Dorsey asked what COLES was trying to sell. Dorsey asked if COLES' customers were trying to buy 125 grams of cocaine when he asked, "What they trying to grab, you say, what you say you tryin' to grab a point?" COLES replied, "Two of 'em" (Meaning 250 grams of cocaine). Dorsey said he was going to call his supplier as soon as he sold his last quantity of cocaine because he had customers waiting.

**November 22, 2013**

On November 22, 2013, COLES told Dorsey that he had a cocaine customer for Dorsey.

**Summary of Call:** COLES told Dorsey he had a customer for Dorsey's remaining ounce and a half of cocaine. COLES said, "….I got a joint for that, but he said he gonna take like an hour…" DORSEY replied, "Alright."

**November 22, 2013**

On November 22, 2013, Dorsey told COLES that he wanted to obtain 125 grams of cocaine ("one point") and that still had some left cocaine from before. Dorsey and COLES discussed Dorsey's goal of making his drug sales quickly so he could earn more money in the future.

**Summary of Call(s):** COLES told Dorsey, "He had one left (a "point"; 125 grams of cocaine) . . . I grabbed it though." COLES asked if Dorsey still had, "that single and the half" (*one and half ounces of cocaine*). Dorsey said he, "only got half." Later, Dorsey told COLES that he only had half of what he told COLES, meaning that he only had, "two and a quizzy" left (*56 grams and a seven grams, two ounces and a quarter ounce*) left. COLES complained that he had customers calling his phone non-stop one minute, and the next minute, the same customers tell him to wait. COLES told Dorsey he was going to call the customer and offer a single and a half or two ounces, and Dorsey said to let him know. Dorsey called COLES and COLES told him to, "grab that jaun," and confirmed that he means the "two and the quizzie." Dorsey asked what he was selling it for, and he said, "25." Dorsey asked what COLES was going to give him for it, and COLES said, "2350" *($2350).* Dorsey complained that he was ready to "drop some of it," *(cook the cocaine)* and now was "only making $150." COLES said he was not making anything. They go on to argue about how to make money. Dorsey explained that he was "selling the singles (*ounces of cocaine*) for $1,100. At the first, the first "point" (*the first 125 grams he got from Church*) I sold em for that." Dorsey explained that, "the first point I sold 'em for a stack ($1,000) just to show him (Church) you know what I mean, I could move 'em. . . . I said I'm gonna make my money off the back end. Then I went up to the 11 (meaning $1,100). . . that's why I said I would ah did that for the twenty three . . . we both make a buck fifty." DORSEY

continues to argue with him that if they do it COLES' way, DORSEY would only make $50, but COLES was making $200. DORSEY assured COLES that he didn't make a ton of money off of the earlier point because of the way he was doing it, and that he "had took a loss for $500," which was likely the loss of half an ounce from the cocaine he had complained to Church about that lost half an ounce when his cook cooked it. Later, COLES called and said he was going to meet Dorsey.

COLES later called Dorsey to say he had arrived at 313 E. 12th Street to pick up the two ounces and a quarter ounce of cocaine for his customer.

**November 23, 2013**

On November 23, 2013, Dorsey engaged in phone calls with Paris Church and defendant COLES regarding COLES purchasing two 125-gram quantities of cocaine from Church.

**Summary of Call(s):** Dorsey called COLES and said, "I said he on one." COLES asked if Dorsey had talked to Church. Dorsey replied, "Yeah." COLES told Dorsey he was going to come see him. Later, COLES asked Dorsey to, "see if dude got two of them." Dorsey then called Church and said, "My peoples had needed two of them." Church asked, "Two what?" Dorsey replied, "What I usually get." *(referring to two 125-gram quantities of cocaine)* Church told Dorsey he could supply the cocaine. Dorsey said he is going to call his people *(meaning COLES)* to see when he would be ready to make the purchase. Dorsey called COLES and COLES said he would be ready in "20-30 minutes."

Church and Dorsey discussed what they were going to charge COLES for the cocaine. DORSEY said, "I charge him you know a 4 and a 7 ($4,700), make two hundred a piece….I said I make a deuce a piece. And you know what I mean you know I been taking care of Kas" (Dorsey was giving Womack money from his drug deals with Church). Dorsey then told Church

15

to bring the cocaine to him at 313 E. 12th Street (Dorsey's stash house), because the deal with COLES was "definitely a go."

Dorsey then called COLES and told him that the price of the cocaine from Church would be "47" *($4700)*. Dorsey told COLES that the price was because he (Dorsey) was, "doing that for Kas (Womack) to put some bread in his pocket." COLES tells Dorsey to tell Church that the price for the cocaine was too expensive. COLES said, "…that's a, that's a, that's a felony favor right there."

Dorsey called Church and told him that COLES said, "the number too steep." Dorsey told Church that the customer was "Kas' (Womack's) young bull, fat boy."

**November 25, 2013**

On November 25, 2013, Dorsey told COLES he was upset with him for backing out of the 250-gram cocaine purchase from Church.

**Summary of Call(s):** Dorsey told COLES he was upset that COLES did not buy the 250 grams of cocaine from Church that Dorsey had arranged. Dorsey said, "….You had that sizzale (*sale*) and …you could have just ran it to me for all that … if you ain't gonna get it." COLES replied, "… you didn't say you could do it." DORSEY replied, "I would have been able to do it…" COLES and Dorsey continue to discuss whether Dorsey could have made the purchase from Church and made the sale to the customer that COLES had in line for the cocaine. DORSEY said, "I could of got from him (Church) and made the joint, just to make it seem like you know what I'm saying, I'm on a tip like this, to make it seem like I'm, I'm really moving it." (*Dorsey said that he could have purchased the cocaine and sold it make Church believe that Dorsey could sale cocaine quickly*). DORSEY reiterated that he would have made the cocaine sale for COLES, and COLES said that he "wasn't looking at it like that."

**November 26, 2013**

On November 26, 2013, Dorsey called Womack to tell him how he had yelled at COLES ("Fat Ass") for backing out on the cocaine deal that Dorsey had arranged through Paris Church.

In a later call, COLES asked Dorsey if he had been re-supplied with cocaine by Church. Dorsey said he had. COLES asked for the price of the cocaine. Dorsey said that COLES already knew the price, and Church has never <u>not</u> had cocaine when Dorsey needed it.

**Summary of Call(s):** COLES asked Dorsey, "Hey, yo, what's up … with the boy "P," he get back on yet?" (*Asking if Paris Church had re-supplied Dorsey with cocaine*.) Dorsey replied, "Yeah, he been back on…" COLES asked, "Yeah, what street he on?" *(Coded language asking about pricing)* Dorsey said he had already told COLES that. Dorsey told COLES that Church has not been out of cocaine whenever DORSEY has needed it.

**November 27, 2013**

On November 27, 2013, Donald Womack called Dorsey to tell him that he had spoken to COLES ("Big Bat") and he (Womack) would help get cocaine for COLES.

**November 27, 2013**

On November 27, 2013, Dorsey asked COLES what the cocaine looked like that COLES had gotten with the help of Womack. COLES said he had not looked at it yet because it was all packaged, but that he thought it looked good. Dorsey asked what COLES paid for the cocaine. COLES said he paid $1,200 per ounce. COLES and Dorsey discussed how much to dilute the cocaine.

**Summary of Call(s):** Dorsey called COLES and asked what the cocaine he had been supplied with looked like. COLES said he didn't know because he hadn't opened up the packaging yet. COLES said, "I looked at it. I mean, I mean, I didn't even open it up and play with it yet."

Dorsey asked, "Is it slab though?" COLES said, "Yeah, it look like it. It's in that, remember how that situation was last, that summer time when it used to be sealed up like that all crazy? . . The ones that be in the like the clear package compressed joint." Dorsey replied, "Oh, alright, the vacuum seal." COLES said, "Yeah, that joint. Them joints." Dorsey asked if the cocaine was fronted to him. COLES said that he had to pay at least something for it. COLES said, "I mean I gave up, I gave up some bread. . . ." COLES then said that he could not cut the cocaine too much because his customers cook it into crack and he could not dilute it too much for them. COLES said, "For my peoples … that play with the water (*cook it*)… I can't do that to them." Dorsey asked if COLES paid "12" for the cocaine (*meaning $1200 per ounce*). COLES replied, "Yeah." COLES said he was selling it at that price because that is where everybody was selling it for and he was not "doing this for nothing." DORSEY responded that selling the cocaine for less is not "selling it for nothing," he said, "It ain't like you doing it for nothing …You still making 51, 52. You know what I mean? You might have the one or two people that you do the 12, but you figure like you know what I mean, the, the, I look at it like this. Quicker I get rid of it … that m—rf---r be like … damn this xxx long-winded like a m---rf---r man. If he moving, he moving." COLES said he wanted "work" *(sell his cocaine)* at his own "pace."

Dorsey then called and told Womack that he just talked to COLES ("Big Bat"), but COLES did not take his advice.

## November 27, 2013

On November 27, 2013, COLES asked Dorsey to go with him to a drug transaction. COLES asked DORSEY if he had a firearm. Dorsey chastised COLES for making a sale outside of their territory. COLES called Dorsey back to report what happened when he made the sale.

**Summary of Call(s):**  Defendant COLES called and asked DORSEY if he was, "strapped up?"  Dorsey responded, "Yeah, why?"  COLES said, "I gotta make ah a drizzog (sale) and I don't . . . I just wanna uh . . .  make sure the situation's safe just in case."  DORSEY responded, "Man you don't need to be making the drip, you ain't gonna be leaving me naked though . . ." COLES told Dorsey, "I was talking about you taking a ride with me."  Dorsey asked where the sale was to take place and COLES said it would be "33rd . . . where Stanley's at."  Dorsey told COLES to tell the customers to come to their territory, but COLES said that he had met his customers in their area a few times in the past. DORSEY admonished, "Yeah but you can't, you can't be doing that though … Like you don't ever know what m---rf---rs' status is man, you can't be doing that man…I don't care where they from they got to come over here…I don't play that s--t man like for real we can't never get too comfortable think we can go every, anywhere and do what we want."  COLES said he would call and ask the customers to come to him.

Approximately one hour later, COLES called Dorsey said that the situation with the customer was strange. COLES said, "…You know what I mean, I wanted to feel them out, xxx tried to give me uh, uh, meet him at a crib across the street from Stanley's or whatever….The whole time…I pull up …I'm like man, like I'm out here I'm in the front.  I'm in the middle of the street or whatever, so he was like yeah, alright . . . I'm a flash the lights just come in, man, nah, I ain't coming in nowhere, we ain't been doing business like that . . . I'm like no I'm right here, just come out.  So, the whole time I go ah, he come out.  . . . I handle the situation . . . So he like ah, ah, that's a little too much, too much sand and whatever. . . . Won't you come in to the house so, so we can ah drop it *(cook the cocaine)* or whatever and we see what it is?  . . . Look man, I ain't got time for all that … I said man, if you want, you can jump in the car with me cause I got other situations to take care of.  I was like, you jump in the car with me and we can

go … one of my spots and do it. . . .”  COLES then told Dorsey he was going to see if a customer wanted to meet, but the customer had not called him back.  Dorsey asked what the customer wanted. COLES said, “He's only getting a single *(an ounce of cocaine)*!”  But COLES said the customer could afford “five of em though.  Five, six of em.”

**December 3, 2013**

On December 3, 2013, defendant COLES, William Dorsey and Donald Womack discuss Womack selling 125 grams of cocaine to a drug dealer in the Chester area (known to law enforcement). Dorsey is getting the point from Church and supplying it to Womack. COLES is taking the point to the drug dealer for them.

**Summary of Call(s):**  Womack called and asked Dorsey if he had spoken to “Fat Boy” (COLES).”  Dorsey said he had not but was, “waiting on somebody to . . . bring me something.” *(waiting on a supplier to bring him cocaine)*  Womack asked if Dorsey had any more cocaine left. Dorsey replied, “Yeah, I got ahh, a point. *(125 grams)*” Womack asked if Dorsey needed it and Dorsey said he probably did but what was up?  Womack replied, “I was gonna tell you give it, give it to … XXX for me. Good stuff.  ‘Cause he had given me … some money yesterday right . . . So he told me to call you. But I don't wanna step on, you know what I mean?”  Dorsey hesitated and then explained, “I ain't never deal with main man.”  Womack said he was going to call “Daz” (another nickname for COLES) about it.

After this call, Dorsey called and told Church that he just spoke to “Kas” (Womack), and that “Kas” told him to “give him the last situation.” Church asked, “Oh okay, you just got one left?”  Dorsey replied, “Yeah.”  Dorsey told Church that he could give it and just wanted Church to know the status.

Dorsey called COLES and COLES told him that someone had just called him. Dorsey told COLES to come and grab it (*meaning come get the cocaine*). Womack called Dorsey and discussed COLES ("Big Bat"). Dorsey said he had just told COLES, "to come grab it." Dorsey called COLES and COLES said he would be delivering the cocaine to XXX and asked whether Dorsey felt comfortable delivering the cocaine himself. Dorsey said that he did not and that is why he told "him" (Womack) that he (Dorsey) was not going to make the delivery. COLES said he would come to Dorsey at 313 E. 12th Street. COLES called Dorsey when he was nearby on Madison Street. Dorsey told COLES the door was open. COLES called again to say that the door was not open. Dorsey said he would have someone open the door.

At approximately the same time, DEA agents observed COLES' black Chrysler parked outside of 313 E. 12th Street. COLES had been stopped and identified as the driver of the vehicle earlier that same day.

## December 5, 2013

On December 5, 2013, Dorsey called COLES. COLES asked whether Dorsey had been re-supplied with cocaine yet. Dorsey said he had not yet been re-supplied. COLES told Dorsey that he had had a sale for Dorsey.

**Summary of Call(s):** Dorsey called COLES. COLES asked Dorsey whether he had been re-supplied with cocaine when he asked, "You still shaking and moving?" Dorsey replied, "Nah, dried out." *(meaning he was out of cocaine)* COLES said he had had a sale for Dorsey when he said, "Shit, and I had something for you too." Dorsey said he was supposed to be resupplied that day. COLES said, "Alright."

**December 6, 2013**

On December 6, 2013, Dorsey called COLES. COLES asked whether Dorsey had been re-supplied yet. Dorsey said he had not yet been resupplied with cocaine, but CHURCH had connected him to a heroin source of supply.

**Summary of Call(s):** Dorsey called COLES, who asked Dorsey if he had been resupplied with cocaine. COLES asked, "Still dried out homeboy?" Dorsey said he had not obtained cocaine, but had obtained heroin when he said, "Yeah, he came through with something though it wasn't with that. It was with that other situation that I used to f--k with."

**December 6, 2013**

On December 6, 2013, COLES asked Dorsey his price for two "logs" of heroin. (*Log being coded language for 10 bundles of heroin*) Dorsey said $1,200. COLES said he would call right back.

**Summary of Call(s):** COLES asked Dorsey, "What you want for two "logs"? Dorsey replied, "120, oh, oh you said two logs …. $1,200." COLES replied, "12, alright I'm a call you right back."

**December 7, 2013**

On December 7, 2013, Dorsey called COLES and COLES said he was "dried out" *(out of cocaine)*. COLES talked to XXX who said Dorsey's prices were too high. Dorsey told COLES to tell XXX to call him. Dorsey promised to call COLES as soon as he was re-supplied with cocaine.

**Summary of Call(s):** Dorsey called COLES and COLES told DORSEY that he was "dried out." COLES told Dorsey that XXX said Dorsey's prices were "too high," and XXX said he was getting "logs" for $300..." DORSEY said that was because XXX was buying smaller packets in

the "logs" when he said, "…that's 'cause he gets 'nicks' *($5 bags)*….Yeah, I got dimes *($10 bags)*, but I can give him 'nicks.'  If that's what he want and I'll give it to him for that number." Dorsey told COLES to tell XXX to call him.

**December 10, 2013**

On December 10, 2013, Dorsey told COLES that he needs to be re-supplied by Church and that he had only gotten 125 grams of cocaine, which he sold right away.

**Summary of Call(s):**  Dorsey told COLES that he had not heard from his supplier but that he had had "one point" of cocaine (125 grams) and he sold it right away.  COLES asked, "What's up, you heard anything yet?"  Dorsey replied, "Nah, I had, I had a little something but that shit went out the door as soon as it came in."  COLES said, "G-dd--n man, I'm salty you ain't call me."  Dorsey said, "It was only only….I couldn't even sell no points or nothing. Yeah, it was only one."

**December 16, 2013**

On December 16, 2013, COLES told Dorsey he was coming to the stash house to see him.

**January 14, 2014**

On January 14, 2014, Dorsey and Womack talked about COLES waiting on Womack to get him more cocaine.

**Summary of Call(s):**  Womack told Dorsey that COLES ("Fat Ass") called him a couple of times and is waiting to be re-supplied; COLES is waiting on Womack.

**January 15, 2014**

On January 15, 2014, COLES called Dorsey to see if Dorsey had been re-supplied with cocaine. Dorsey said he expected to be supplied the following day. COLES asked what the "hold-up" was. Dorsey said he would let him know in the next half hour.

**Summary of Call(s):** COLES asked Dorsey, "Did it ever happen?" Dorsey replied, "Nah, tomorrow. I'll hit your phone, soon as." COLES called again and asked, "What's the hold-up baby?" Dorsey replied, "I don't know man. I'm a let you know within the next half hour."

## III.  SENTENCING CALCULATION

### A.  Statutory Maximum Sentence

The Court may impose the following statutory maximum and mandatory minimum sentences:

**Criminal No. 14-496**

For conspiracy to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1)(A): Life imprisonment, with a 10-year mandatory minimum term of imprisonment; five years of supervised release up to a lifetime of supervised release; a $10,000,000 fine, and $100 special assessment.

**Criminal No. 14-516**

**Count One:** Conspiracy to distribute 500 grams or more of cocaine, a Schedule II controlled substance, in violation 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(B): 40 years imprisonment, with a five year mandatory minimum term of imprisonment, a mandatory minimum term of four years of supervised release up to a lifetime of supervised release, an $8,000,000 fine, and a $100 special assessment.

**Counts Two, Three, Four, Five, Six, and Seven**: Unlawful use of a communication facility in furtherance of drug trafficking, in violation of 21 U.S.C. § 843(b): a maximum of eight years' imprisonment, a minimum of one year of supervised release, a $250,000 fine, and a $100 special assessment on each count of conviction.

**Total Statutory Maximum and Mandatory Minimum Sentence in 14-CR-516**: 40 years imprisonment, with a 5 year mandatory-minimum term of imprisonment, a mandatory-minimum of 4 years of supervised release up to a lifetime of supervised release, $9,500,000 fine, and $700 special assessment. Forfeiture of all proceeds from offense, all property involved in or all facilitating property in the defendant's drug trafficking also may be ordered

**Total Statutory Maximum and Mandatory Minimum Sentence (combined) in Both Cases:** Life imprisonment, with a 10-year mandatory minimum term of imprisonment; 10 years of supervised release up to lifetime supervised release, a fine of $19,500,000, and a $800 special assessment.

B.      Withdrawal of 851 Notices in this Case

In this case, the government previously filed an information under 21 U.S.C. § 851 alleging the defendant's earlier commission of a "felony drug offense," which enhanced the statutory penalties. However, on December 21, 2018, the First Step Act was enacted, changing the description of the type of prior offense that results in increased penalties under 21 U.S.C. § 841(b)(1). Under the First Step Act, the government must now prove the prior commission of a "serious drug felony" or a "serious violent felony" in order to invoke the increased penalty provisions of Sections 841(b)(1)(A) and (B). Commission of a previous "felony drug offense," as defined under earlier law, remains relevant in increasing the maximum sentence for offenses subject to Section 841(b)(1)(C).

As relevant here, a "serious drug felony" is "an offense described in section 924(e)(2) of title 18 for which—(A) the offender served a term of imprisonment of more than 12 months; and (B) the offender's release from any term of imprisonment was within 15 years of the commencement of the instant offense." 21 U.S.C. § 802(57). The prior conviction of Coles charged in the 851 notice in this case in fact qualifies as a "serious drug felony" under the new law. However, the government recognizes that the pertinent facts which must now be proven to gain an increased sentence – the length of incarceration and the time of release – must, pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), be charged in the indictment and admitted by the defendant in his plea or proven at trial. That did not take place here, and cannot take place at this late date.

The changes have no effect on the guideline calculation in this case. Nor, we submit, should the reduced maximum and minimum sentences have any effect at all on the sentencing determination. The advisory sentencing range is the same, and the change in the statutory penalties is just a fortuity of timing. If the defendant were charged with the same offenses today, the First Step Act would apply, the government would charge the previous serious drug felony, and the applicable statutory penalties would be exactly the same as they were at the time that Coles committed the offenses at issue.

    C.    <u>Sentencing Guidelines Calculation</u>

The Probation Office submitted a revised Presentence Investigation Report ("PSR") dated April 1, 2019, which sets forth the application of the U.S. Sentencing Guidelines. The government agrees with the Probation Department's calculations.

**Criminal No. 14-496**

As detailed below, the defendant's criminal history category is **VI**, because he is a career offender. ¶ PSR 120-121. The base offense level for 14-CR-496 is **32** based on USSG § 2D1.1(a)(5) and (c)(4). The defendant is accountable for the distribution of approximately 18 kilograms of cocaine. However, because the defendant has been convicted of two felony controlled substance offenses, he is classified as a career offender under USSG § 4B1.1(b)(1). Further, the offense level is **37** because the statutory maximum for the offense of conviction is life imprisonment. Based on a total offense level of **37** and a criminal history category of **VI**, the defendant's guideline range is **360 months to life imprisonment**.

**Criminal No. 14-516**

As detailed below, the defendant's criminal history category is **VI**, because he is a career offender. ¶ PSR 120-121. The base offense level for 14-CR-516 is 24 however because the defendant is a career offender and the maximum term of imprisonment is 40 years the offense level is 34. After subtracting three levels for acceptance of responsibility, the defendant's total offense level is 31. With an offense level of **31** and a criminal history score of **VI,** the Sentencing Guidelines range is **188 to 235** months' imprisonment. As set forth more fully below, the government respectfully requests that this Court accept the parties' recommended sentence under R. 11(c)(1)(C) of 120 months imprisonment to run concurrent to the sentence imposed in criminal number 14-496.

## IV.    ANALYSIS OF SECTION 3553(a) FACTORS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual

sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (quoting *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 133 S. Ct. at 2084. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.*

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[1]

---

[1]     Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" *United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (*quoting United States v. Navedo Concepcion*, 450 F.3d 54, 58 (1st Cir. 2006)).

**Consideration of the 3353(a) Factors**

**A.      The Nature and Circumstances of the Offense, and the History and Characteristics of the Defendant**

     **1.      Nature and Circumstances of the Offense**

After having previously sustained multiple convictions for the following offenses: corrupting the morals of children (2001), false identification to law enforcement (2002), fleeing or attempting to elude police officers (2003), possession with intent to deliver a controlled substance (2004), carrying a concealed deadly weapon (firearm) (2007), and another conviction for possession with intent to deliver a controlled substance and possession of a firearm not to be carried without a license (2007), disorderly conduct (2013), and criminal mischief/disorderly conduct (2013) the defendant conspired with Donald Womack, William Dorsey, Paris Church, and others to obtain and distribute kilogram quantities of cocaine in the Chester, Pennsylvania area. The defendant engaged in this drug trafficking activity notwithstanding two prior felony convictions for controlled substance offenses, the latter of which the defendant received a 30 to 60 month sentence of imprisonment.

The evidence presented in the trial in Criminal Indictment 14-496 demonstrated that defendant Coles conspired with Donald Womack, Paris Church, and Michael Pinkney to obtain 18 to 20 kilograms of cocaine from a source of supply in Mexico for the purpose of bring it to Chester for re-sale.

The evidence set forth during the change of plea hearing in Criminal Indictment 14-516 demonstrated that defendant Coles, along with Dorsey and Womack shared cocaine sales with each other and shared their methods of distributing cocaine in the Eastern District of

Pennsylvania. Coles further enlisted Dorsey's assistance in coming along with a firearm to provide security to Coles as he made a sale in unfamiliar territory.

The defendant's drug trafficking is serious and contributed to the harm caused to the community in the city of Chester.

Thus, consideration of the nature of the offense as well as Section 3553(a)(1), counsels in favor of a sentence within the guideline range of 360 months' imprisonment in case 14-CR-496 and a sentence of 120 months in 14-CR-516 to run concurrent to the sentence in 14-496, as recommended by the parties guilty plea agreement in 14-CR-516.

### 2. The History and Characteristics of the Defendant

The defendant, who is now 36 years old, was raised by his mother in the city of Chester, Pennsylvania. PSR ¶ 131.

The defendant is the father of one child. ¶ 136. He reportedly graduated from Chester High School however the PSR indicated that school records showed that he did not graduate. PSR ¶ 150. The defendant reported some legitimate employment specifically receiving cash payments from a friend's vending machine business and later verified work as an unlicensed barber from 2009 until 2013. PSR ¶ 154. The defendant would like to pursue a job in the culinary field or as a liscensed barber upon his release from custody. PSR ¶ 155.

Defendant Coles' prior adult criminal convictions are as follows:

Convictions:

1. On October 19, 2001 (crime date: April 25, 2001), in the Delaware County Court of Common Pleas, Coles plead guilty to corrupting the morals of children (CP-23-CR-0001042-2001). Coles was sentenced to 6 to 23 months imprisonment in Delaware County Prison. This offense involved the defendant, and many others, sexually assaulting a 15 year-old victim at a hotel in Essington, PA.

2. On June 17, 2002 (crime date: December 29, 2001), in the Delaware County Court of Common Pleas, Coles pleaded guilty to one count of providing false information to law enforcement (CP-23-CR-0001279-2002). Coles was sentenced to six months probation. This offense involved the defendant providing a false name during a traffic stop.

3. On February 25, 2003 (crime date: October 16, 2002), in the Delaware County Court of Common Pleas, Coles plead guilty to fleeing or attempting to elude law enforcement officers, (CP-23-CR-0006130-2002). Coles was sentenced to one year of probation. This offense involved the defendant fleeing from a traffic stop, travelling the wrong way on a one-way street, and then continuing to flee on foot.

4. On February 15, 2005 (crime date: February 2, 2004), in the Delaware County Court of Common Pleas, Coles plead guilty to possession with the intent to deliver controlled substances. (CP-23-CR-0003302-2004). Coles was sentenced to 11.5 to 23 months imprisonment.

5. On January 25, 2007 (crime date: June 30, 2006), in the New Castle County Superior Court, Wilmington, Delaware, Coles plead guilty to carrying a concealed deadly weapon. Coles was sentenced to two years of imprisonment, suspended for 18 months of probation.

6. On February 13, 2007 (crime date: July 18, 2006), in the Delaware County Court of Common Pleas, Coles plead guilty to Possession with the intent to deliver a Controlled Substance (crack cocaine) and the carrying firearms that are not to be carried without a license (CP-23-CR-0007578-2006). Coles was sentenced to 30 to 60 months of imprisonment.

7. On November 21, 2013 (crime date: July 8, 2013), in the Delaware County Court of Common Pleas, Coles plead guilty to Disorderly Conduct (CP-23-CR-0004840-2013). Coles was sentenced to a $150 fine.

8. On November 21, 2013 (crime date: September 13, 2013) in the Delaware County Court of Common Pleas, Coles plead guilty to Criminal Mischief and Disorderly Conduct (CP-23-CR-0007389-2013). Coles was sentenced to pay a fine.

In case 14-CR-496, the government recommends a sentence of 360 months' imprisonment considering the defendant's prior convictions for the same or similar offenses that he was convicted of at trial. In case 14-CR-516, the government recommends a sentence of 120 months' imprisonment that would run concurrent to the defendant's sentence in 15-CR-496.

**B.** **The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense**

A sentence within the guideline range of incarceration in case 14-CR-496 would reflect the seriousness of the defendant's drug offenses, and adequately punish him for his criminal behavior. Furthermore, it would promote respect for the law both in the defendant and in others. The committed the instant offenses after sustaining a myriad of prior felony drug convictions and other convictions, including his federal robbery conviction. The defendant has multiple prior convictions for escape and tried to flee to avoid apprehension in this indictment.

As explained above, the defendant's crimes were very serious, and merit an equally serious sentence. The Court should impose a sentence that properly reflects these considerations and communicates to the defendant and society that the justice system will not tolerate this type of criminal behavior.

**C.** **The Need to Afford Adequate Deterrence to Criminal Conduct, and to Protect the Public from Further Crimes of the Defendant**

A serious sentence is also necessary to protect the public from further criminal activity by the defendant, at least while he is incarcerated. A sentence within the guideline range of 360 months' imprisonment in case 14-CR-496 would incapacitate the defendant for a significant period of time, and would send a clear message that any future crimes will not be tolerated. Society, and most importantly the city of Chester, is entitled to be protected from the defendant's behavior, and the need to protect the community supports an imposition of a sentence within the Guideline range.

**D.** **The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

There is no need in this case to adjust the sentence in order "to provide [the defendant] with . . . educational or vocational training, medical care, or other correctional treatment . . . ." U.S.S.G. § 3553(a)(2)(D).

**E.** **The Guidelines and Policy Statements Issued by the Sentencing Commission and the Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

While the Sentencing Guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the Guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments.

As the Third Circuit explained:

> Even under the current advisory system, district courts must "meaningfully consider" § 3553(a)(4), i.e., "the applicable category of offense . . . as set forth in the guidelines." The section of *Booker* that makes the Guidelines advisory explains that "the remaining system, while not the system Congress enacted, nonetheless continue[s] to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary." *Booker*, 543 U.S. at 264-65 (emphasis added). The Guidelines remain at the center of this effort to "avoid excessive sentencing disparities," and, as the *Booker* Court explained, the Sentencing Commission will continue "to promote uniformity in the sentencing process" through the Guidelines. *Id.* at 263. We have likewise observed that the "'Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country.'" *Cooper,* 437 F.3d at 331 (quoting *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005)).

*United States v. Ricks*, 494 F.3d 394, 400 (3d Cir. 2007) (emphasis in original).  Therefore, the

Supreme Court has held that "district courts must begin their analysis with the Guidelines and

remain cognizant of them throughout the sentencing process" in order to assure fair,

proportionate, and uniform sentencing of criminal offenders.  *Gall*, 552 U.S. at 50 n.6. *See also*

*United States v. Langford*, 516 F.3d 205, 211-13 (3d Cir. 2008) (explaining at length the

continued importance of the guidelines).[2]

As Congress has codified, it is part of our sense of justice that similarly situated

defendants should be given similar sentences.  Other defendants who engage in drug trafficking

should expect to receive, and do receive, serious sentences.  This defendant should be treated no

---

[2] In a widely circulated form sentencing memorandum, the Defender Association in the Eastern District of Pennsylvania has criticized any reliance on the Sentencing Guidelines, asserting that the notion of expert guidance is a "myth."  However, as seen above, that view has specifically been rejected by the Supreme Court and the Third Circuit.  Likewise, the Defenders' criticism that the Guidelines have not evolved based on Congressional and judicial input is specifically rebutted in the Supreme Court's decisions in *Booker* and *Rita*.  *See Rita*, 551 U.S. at 348-51; *Booker*, 543 U.S. at 263.

Ultimately, the Defenders' main complaint is that the guidelines are often stringent, requiring significant punishment for criminal conduct, and giving little if any weight to many excuses and pleas for leniency often offered by convicted criminals.  But the Guidelines plainly reflect a longstanding legislative goal to significantly punish criminal conduct, given that crime takes a harsh toll on society in general and victims in particular.  While courts have the discretion to assess each case individually, we submit that it is ill-advised for any court to oppose the broader Congressional goal by, contrary to the Congressional demand for uniformity in sentencing, devising a judge-by-judge assessment of the severity of crime.  *See Ricks*, 494 F.3d at 400 (observing that, as a general rule, "it is the role of Congress, and not the courts, to determine what crimes are worse than others").  Indeed, the Defenders do not cite any alternative to reference to the Guidelines, seeming to favor instead ad hoc evaluations of the severity of criminal offenses, made by hundreds of federal judges in individual courtrooms.  Such an approach is plainly unwarranted and inadvisable as a matter of law and policy.

differently. The government therefore respectfully requests that the Court impose a sentence within the guideline range of imprisonment.

## V.    **CONCLUSION**

In sum, all of the appropriate sentencing considerations support the imposition of the sentence within the guideline range of 360 months of imprisonment in case number 14-CR-496. The government further requests that this Court accept the parties recommended sentence in case number 14-CR-516 of 120 months imprisonment to run concurrently to the sentence imposed in 14-CR-496.

Respectfully submitted,

WILLIAM M. MCSWAIN
United States Attorney

Robert E. Eckert
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Government's Sentencing Memorandum was served by electronic mail transmission to:

**_Counsel for Nathanial Da-Meir Coles_**
**Email:** dina@dinachavar.com

Robert E. Eckert
Assistant United States Attorney

Date:   June 12, 2019