# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 14-496** |
| | | **14-516** |
| **NATHANIEL COLES** | **:** | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Defendant Nathanial Coles seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). This motion should be denied, given the danger that the defendant presents to the community, the time remaining on his sentence, and all other 3553(a) considerations.

## I.    Background.

### A.    Criminal Conduct.

### Criminal No. 14-496

On September 17, 2014, a federal grand jury returned a one-count indictment charging defendant Coles and others with conspiracy to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846.

On February 16, 2017, after a five-day trial, a jury unanimously convicted defendants Paris Church, Donald Womack, and Nathaniel Coles, of the sole count of the indictment, conspiracy to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846.

From on or about January 2014 to in or about February 2014, defendant Donald Womack and co-defendants Michael Pinkney, Nathaniel Coles, and Paris Church conspired to obtain 18 to 20 kilograms of cocaine from a source of supply in Mexico ("Daniel"). This source of supply ("Daniel") was obtained through a connection of defendant Womack. In consideration for this deal, the defendants sent money to an address in Mexico given to them by "Daniel." However, the transaction was not completed.

The evidence of this drug trafficking crime was obtained through intercepted communications between the co-defendants and with "Daniel" during the course of a court-authorized wiretap investigation conducted by the Drug Enforcement Administration ("DEA") and Federal Bureau of Investigation ("FBI").

### Criminal No. 14-516

On September 25, 2014, a federal grand jury returned an Indictment charging defendant Coles, along with William Dorsey and Donald Womack, with one count of conspiracy to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846 and 841(a)(1), (b)(1)(B); and six counts of unlawful use of a communication facility in furtherance of a drug felony, in violation of 21 U.S.C. § 843(b). On November 28, 2018, defendant Coles pleaded guilty to the indictment in accordance with a guilty plea agreement made under Federal Rule of Criminal Procedure 11(c)(1)(C).

This matter involved a conspiracy that transpired from November 20, 2013, through January 15, 2014, in Chester, Pennsylvania. Phone calls intercepted during a court-authorized Title III wiretap investigation of the phone of William Dorsey revealed extensive conversations with Coles regarding the purchasing, pricing, and method of distributing cocaine. Dorsey discussed with Coles the 250-gram quantities of cocaine Dorsey was obtaining from his supplier, Paris Church. On some occasions, Coles assisted Dorsey in securing customers to purchase cocaine from Dorsey. Dorsey supplied Coles with cocaine. Womack also supplied Coles with cocaine and at times arranged for Dorsey to give 125 grams of cocaine to Coles to distribute to one of Womack's customers.

Dorsey counseled Coles on how to handle his cocaine business, and discussed with Womack the fact that Coles was not listening to him. In one instance, Coles asked Dorsey to accompany him with a gun to make a drug sale because Coles was worried about his safety in the area where transaction was set to occur. Dorsey admonished Coles that he should only engage in drug sales in their territory.

On November 30, 2018, this Court consolidated 14-CR-496 and 14-CR-516 for the purposes of sentencing. This Court accepted the sentencing recommendation of the parties in docket number 14-CR-516 and sentenced Coles to 120 months' imprisonment, eight years of supervised release, to run concurrently to the term of imprisonment and supervised release imposed in 14-CR-496, and a $700 special assessment. In docket number 14-CR-496, this Court imposed a sentence of 240 months' imprisonment, ten years of supervised release, and a $100 special assessment.

The defendant is serving his sentence at Ray Brook FCI, with an anticipated release date of October 11, 2031. He has served approximately 76 months, and has credit for good conduct time of approximately 11 months, for total time served of approximately 87 months. He has not committed any disciplinary infraction during his time in custody.

**B.      Request for Compassionate Release.**

On July 21, 2020, the defendant submitted a request for compassionate release to the warden. The request was based on Mr. Coles' mother's medical ailments and the fact that someone is needed to take care of her. The warden denied this request. On January 26, 2021, the defendant submitted a motion to this Court for compassionate release, that is premised on his own medical circumstances as well as his mother's situation.

The undersigned obtained the medical records of the defendant for the past year from BOP, and files a copy under seal as an exhibit to this response. The records reveal that the defendant, who is 38 years old, is in good health. He suffers from no chronic condition, and takes no prescription medication.

He presents two risk factors in relation to COVID-19. First, he is modestly obese. BOP has not regularly measured his weight, as it has not presented a concern. On July 16, 2019, his weight was recorded at 243 pounds, which at 6' tall is a body mass index (BMI) of 33. He also states that he has a history of smoking, though there is no confirmation of that in the records, nor any evidence of a smoking-related ailment.

## C.       BOP's Response to the COVID-19 Pandemic.

As the Court is aware, from the moment the pandemic began, the Bureau of Prisons made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control and the World Health Organization. Those efforts continue.

This office does not oppose compassionate release based on the current status of an institution in mitigating the spread of the virus. Even if the situation at a particular prison appears under control at the moment, we recognize that the virus is pernicious and may rapidly spread in a prison environment at any time. Therefore, our focus is on whether an inmate is at greater risk of an adverse outcome were he to contract the disease, and if so, whether consideration of all sentencing factors nevertheless warrants continued confinement.[1]

However, it is reassuring, and we advise for the information of the Court, that BOP has had success at many institutions in limiting the spread of the virus, and also in stemming outbreaks when they occur. BOP's "action plan" is described in detail at www.bop.gov/coronavirus/. As part of that plan, all newly arriving inmates are

---

[1] As a judge recently explained, "The overall number of COVID-19 cases reported in BOP facilities continues to grow. However, a facility that at one point has a high number of cases may manage to control its infection rate, while a facility with few cases may experience a rapid outbreak. This means that, except in a rare situation, the Court does not rely solely on a snapshot of COVID-19 numbers in any particular prison to constitute an 'extraordinary and compelling' reason for compassionate release, as that number will likely change in the near future. Thus, the new information presented by Mr. Beckett regarding the COVID-19 infection rate at Fort Dix FCI does not constitute an 'extraordinary and compelling reason' for compassionate release." *United States v. Beckett*, 2021 WL 92803, at *1 (D. Alaska Jan. 11, 2021) (Gleason, J.).

quarantined, and not released into the general population until the passage of 14 days and return of a negative test; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry.

In addition, acting under the authority granted in the CARES Act, BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences.[2] This action, combined with the reduced number of new arrivals during the pandemic, and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, designed to increase the possibility of social distancing and reduce the strain on BOP resources. The total BOP population, which was approximately 170,000 at

---

[2]  This Court does not have authority to grant a transfer to home confinement, or review BOP's administrative decision regarding that issue. *See* 18 U.S.C. § 3621(b) (BOP's designation decision is not subject to judicial review). *See also, e.g., United States v. Gray*, 2020 WL 6822949, at *2 (E.D. Pa. Nov. 20, 2020) (Sanchez, C.J.); *United States v. Rodriguez-Collazo*, 2020 WL 2126756, at *2-3 (E.D. Pa. May 4, 2020) (Younge, J.); *United States v. Pettiway*, No. CR 08-129, 2020 WL 3469043, at *2 (E.D. Pa. June 25, 2020) (Bartle, J.); *United States v. Torres*, 2020 WL 3498156, at *5-6 (E.D. Pa. June 29, 2020) (Kearney, J.); *United States v. Cruz*, 2020 WL 1904476, at *4 (M.D. Pa. Apr. 17, 2020); *United States v. Mabe*, 2020 U.S. Dist. LEXIS 66269, at *1 (E.D. Tenn. Apr. 15, 2020) ("the CARES Act places decision making authority solely within the discretion of the Attorney General and the Director of the Bureau of Prisons. . . . This Court therefore does not have power to grant relief under Section 12003 of the CARES Act.").

the beginning of the pandemic, is now more than 10% smaller, at the lowest level in decades.

When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.

All of these strenuous efforts have been fruitful. To be sure, there is no way to stop this virus, until vaccines are available and effective, and inmates inevitably will be infected and some may succumb, just as in the population at large. But it is notable that the rate of deaths in federal prisons as a whole has largely matched that in the total general U.S. population, a notable achievement given the known risks of viral spread in a congregate prison setting.

Specifically as it relates to the defendant, BOP's aggressive efforts have been modestly successful thus far at FCI Ray Brook. That institution houses 706 inmates. At present, there is one inmate who is reported positive, and is isolated while he is treated/recovers. There are also 131 current inmates who previously tested positive during the past year and have recovered. There has not been a COVID-related death at this institution. The latest statistics are available at www.bop.gov/coronavirus.

## II.    Discussion.

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act on December 21, 2018, provides in pertinent part:

(c) Modification of an Imposed Term of Imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Further, 28 U.S.C. § 994(t) provides: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Accordingly, the relevant policy statement of the Commission is binding on the Court. *See Dillon v. United States,* 560 U.S. 817, 827 (2010) (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[3]

---

[3] Prior to the passage of the First Step Act, while the Commission policy statement was binding on the Court's consideration of a motion under § 3582(c)(1)(A), such a motion could only be presented by BOP. The First Step Act added authority for an

The Sentencing Guidelines policy statement appears at § 1B1.13, and provides that the Court may grant release if "extraordinary and compelling circumstances" exist, "after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable," and the Court determines that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."

Critically, in application note 1 to the policy statement, the Commission identifies the "extraordinary and compelling reasons" that may justify compassionate release. The note provides as follows:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2) [regarding absence of danger to the community], extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)     Medical Condition of the Defendant.—
>
>     (i)     The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
>     (ii)     The defendant is—

---

inmate himself to file a motion seeking relief, after exhausting administrative remedies, or after the passage of 30 days after presenting a request to the warden, whichever is earlier.

Under the law, the inmate does not have a right to a hearing. Rule 43(b)(4) of the Federal Rules of Criminal Procedure states that a defendant need not be present where "[t]he proceeding involves the correction or reduction of sentence under Rule 35 or 18 U.S.C. § 3582(c)." *See Dillon*, 560 U.S. at 827-28 (observing that, under Rule 43(b)(4), a defendant need not be present at a proceeding under Section 3582(c)(2) regarding the imposition of a sentencing modification).

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

In general, the defendant has the burden to show circumstances meeting the test for compassionate release. *See, e.g.*, *United States v. Neal*, 2020 WL 5993290, at *4 (E.D. Pa. Oct. 9, 2020) (Gallagher, J.); *United States v. Adeyemi*, 2020 WL 3642478, at *16 (E.D. Pa. July 6, 2020) (Kearney, J.). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (citations omitted).

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not alone provide a basis for a sentence reduction. The guideline policy statement describes specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. The Third Circuit held: "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). *See also United States v. Roeder*, 807 F. App'x 157, 160-61 (3d Cir. 2020) (per curiam) (not precedential) ("the existence of a widespread health risk is not, without more, a sufficient reason for every individual subject to a properly imposed federal sentence of imprisonment to avoid or substantially delay reporting for that sentence."), *id.* at 161 n.16 ("Similarly, the existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit."). *See also United States v. Hegyi*, 2020 WL 7090710, at *2 (N.D. Ind. Dec. 4, 2020) ("the presence of COVID-19 in a prison, even in large numbers, does not justify compassionate release on its own.").

However, the government acknowledges that an inmate who presents a risk factor identified by the CDC as increasing the risk of an adverse outcome from COVID-19 presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in note 1(A), as, due to his condition, the defendant may be less able to

protect himself against an unfavorable outcome from the disease. *See United States v. Tartaglione*, 2020 WL 3969778, at \*5-6 (E.D. Pa. July 14, 2020) (Slomsky, J.) ("a prisoner seeking release due to COVID-19 must at least show: (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and (2) an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held" (quoting *United States v. Somerville*, 2020 WL 1627331, at \*20 (W.D. Pa. May 29, 2020)).

The CDC's list of risk factors was most recently updated, based on the latest data, on December 23, 2020. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. It reports a list of conditions that certainly present a risk, with a separate list of conditions regarding which there is insufficient data to conclude anything other than that these conditions "might" put a person at risk. Therefore, inmates with conditions on the latter list do not present an extraordinary basis for relief. "Given the lack of data and certainty regarding this second group of conditions, the fact that Defendant has a condition that may increase his risk for severe illness from COVID-19, without more, does not present an 'extraordinary and compelling reason' under the compassionate release statute and U.S.S.G. § 1B1.13." *United States v. Durham*, 2020 WL 5577884, at \*2 (W.D.N.C. Sept. 17, 2020). *See also United States v. Hill*, 2020 WL 6202322, at \*3 (E.D. Pa. Oct. 22, 2020) (Schmehl, J.) (court does not consider a condition in the "might" category); *United States v. Moldover*, 2020 WL 6731111, at \*9 (E.D. Pa. Nov. 13, 2020) (Slomsky, J.) ("District courts have routinely denied motions for compassionate release based on allegations of only potential

COVID-19 risk factors, including asthma and hypertension."); *United States v. Alejo*, 2020 WL 6122528, at *1 (S.D. Ga. Oct. 16, 2020) ("at this point, the Court cannot conclude that the "might" category qualifies an illness as sufficiently serious to warrant compassionate release in and of itself.").

Here, the defendant's condition of obesity and a history of smoking, which are certain CDC risk factors, meets that test and permits consideration for compassionate release during the pandemic. Nevertheless, the defendant's motion should be denied.

Any risk to the defendant is mitigated by the fact that he is a young man of 38 years of age, and in good health. Further, his condition of modest obesity does not outweigh that conclusion. Courts have been reluctant in general to grant compassionate release where, as here, mild obesity is presented, particularly where the defendant is relatively young and does not present any related ailment. *See, e.g.*, *United States v. Whiteman*, 2020 WL 4284619, at *1 (E.D. Pa. July 27, 2020) (Pappert, J.) (mild obesity and hypertension, of 42-year-old defendant, fall short of establishing extraordinary circumstances); *United States v. Concepcion*, 2021 WL 50852, at *7 (E.D. Pa. Jan. 6, 2021) (Slomsky, J.) (BMI of 32.2 does not justify release); *United States v. Williams*, 2020 WL 4756743 (E.D. Pa. Aug. 17, 2020) (Pratter, J.) (mild asthma and obesity with a BMI of 31.5 are not extraordinary circumstances in the context of confinement at an institution that has not had a significant number of positive cases); *United States v. Whitsell*, 2020 WL 3639590, at *4 (E.D. Mich. July 6, 2020) (declines to view obesity alone as sufficient; "Other district courts have granted compassionate release only upon a finding of numerous and severe medical conditions that place them at a significantly

higher risk for severe illness from COVID-19."); *United States v. Edison*, 2020 WL 3871447, at *3 (D. Minn. July 9, 2020) (obesity alone (BMI of 35.4) "fails to meet the demanding standard for compassionate release."); *United States v. Aguilar*, 2020 WL 6081779, at *4 (N.D. Cal. Oct. 15, 2020) (denied to 27-year-old with BMI of 37.5; the court cites numerous cases and "notes that other courts have declined to grant compassionate release to otherwise healthy and young inmates with obesity as their only cognizable risk factor, absent other indications of serious medical risk."); *United States v. Ackley*, 2020 WL 4193273, at *4 (N.D. Iowa July 21, 2020) (31-year-old's ailments are all minor, with only a risk factor of a BMI of 32.2, "which puts him only marginally into the CDC's risk category.").

His claimed history of smoking does not change this assessment. In its revised guidance issued on October 6, 2020, the CDC added "smoking" to the list of risk factors for severe illness, stating, "Being a current or former cigarette smoker increases your risk of severe illness from COVID-19." The CDC previously stated: "Current cigarette smokers are defined as people who reported smoking at least 100 cigarettes during their lifetime and who, at the time they participated in a survey about this topic, reported smoking every day or some days."

https://www.cdc.gov/tobacco/data_statistics/fact_sheets/fast_facts/index.htm (accessed Oct. 15, 2020).

The defendant presents no details regarding his tobacco usage other than to say that he has a 20-year history of smoking. ECF 182; Def. Mot. at 2. But what is known is that he has been in custody since September of 2014, and smoking has been banned in all

federal prison facilities since 2006. It is well established that the health risks presented by smoking drop dramatically once a user quits and years pass.[4] Here, moreover, the defendant presents no ailments associated with smoking, such as cancer or pulmonary problems. The government accordingly submits the his possible status as a smoker many years ago does not outweigh the other 3553(a) factors militating against release. *See, e.g.*, *United States v. Jones*, 2020 WL 7640944, at *3 (E.D. Pa. Dec. 23, 2020) (Pappert, J.) (history of smoking does not support release, where the defendant "provides no detail regarding his tobacco usage, presents no ailments associated with smoking and has been in federal prison since 2011, where smoking is banned."); *United States v. Brady*, 2020 WL 7323366, at *3 (D.R.I. Dec. 11, 2020) ("smoking history alone is not sufficient for this Court to find extraordinary and compelling grounds for release, especially when Ms. Brady is only forty-five years old and does not present with any additional comorbidities."); *United States v. Kupahu*, 2020 WL 7246911, at *6 (D. Haw. Dec. 9, 2020) (history of smoking of otherwise healthy 45-year-old by itself does not create an

---

[4]  The CDC states:

- Quitting smoking cuts cardiovascular risks. Just 1 year after quitting smoking, your risk for a heart attack drops sharply.
- Within 2 to 5 years after quitting smoking, your risk for stroke may reduce to about that of a nonsmoker's.
- If you quit smoking, your risks for cancers of the mouth, throat, esophagus, and bladder drop by half within 5 years.
- Ten years after you quit smoking, your risk for dying from lung cancer drops by half.

*See* https://www.cdc.gov/tobacco/data_statistics/fact_sheets/health_effects/effects_cig_smoking/index.htm#reduced-risks (accessed Oct. 15, 2020).

extraordinary circumstance); *United States v. Cates*, 2020 WL 6136212, at \*9 (D. Me. Oct. 19, 2020) (no exceptional circumstance where 30-year history of heavy smoking is the only risk factor).

Turning to Coles' family circumstances, they too do not support relief. He asserts that his mother is 65 years old, lives alone in her home, and suffers from a variety of ailments. That is not sufficient.

The defendant's desire to care for a parent is not sufficient to obtain the extraordinary remedy he seeks. The guideline policy statement provides that qualifying family circumstances exist where the defendant is the only available caregiver for a spouse or for minor children. In contrast, "Judges in this District have yet to find care for elderly or ill parents rises to the level of extraordinary and compelling circumstance warranting release." *United States v. Siberio-Rivera*, 2020 WL 7353367, at \*1 (E.D. Pa. Dec. 15, 2020) (Pappert, J.). *United States v. Gaskin*, 2020 WL 7263185, at \*4 (E.D. Pa. Dec. 9, 2020) (Pratter, J.) (the desire to care for elderly parents does not qualify as extraordinary). *See also, e.g.*, *United States v. Goldberg*, 2020 WL 1853298, at \*4 (D.D.C. Apr. 13, 2020) (desire to help care for elderly parents is admirable but does not qualify under the application note); *United States v. Ingram*, 2019 WL 3162305 (S.D. Ohio July 16, 2019) ( "Many, if not all inmates, have aging and sick parents. Such circumstance is not extraordinary."); *United States v. Henry*, 2020 WL 3791849, at \*4 (E.D.N.Y. July 6, 2020) ("Care of parents is not a qualifying basis for release."); *United States v. Ingram*, 2020 WL 3183698, at \*2 (D. Md. June 15, 2020) (desire to care for mother, who is nearing 60 and has risk factors, is insufficient); *United States v. Thorpe*,

2019 WL 6119214 (C.D. Ill. Nov. 18, 2019) (grandfather's ill health did not present an extraordinary circumstance).

In any event, the defendant fails to carry his burden to show that his mother needs care, and that he is the only available caregiver for his parent. Apparently, she is presently living on her own in her own home, and does not require immediate care. *See, e.g.*, *United States v. Hill*, 2020 WL 3037226 (W.D. Ark. June 5, 2020) (there is insufficient evidence that the defendant is the only caregiver for his ailing wife, and even if he were, service of 20 months of 84-month sentence is inadequate for sale of meth from the same home he would share with his wife); *United States v. Marshall,* 2020 WL 114437 (W.D. Ky. Jan. 9, 2020) (compassionate release sought on the basis of grandfather's declining health, but defendant is not the only available caregiver); *United States v. Crandle*, 2020 WL 2188865, at *4 (M.D. La. May 6, 2020) (failed to present evidence that he is only caregiver for ailing parents); *United States v. Cruz-Rivera*, 2020 WL 5993352, at *7 (E.D. Pa. Oct. 9, 2020) (Slomsky, J.) (the defendant does not carry his burden to show that his wife is incapacitated due to her breast cancer or diabetes, or that he would be the only available caregiver to their minor child if his wife were incapacitated); *United States v. Moore*, 2020 WL 7024245 (E.D. Pa. Nov. 30, 2020) (Kearney, J.) (the need for care of the inmate's mother is not an extraordinary circumstance where he has a younger sister and cousin otherwise capable of taking care of his mother).

For all of these reasons, Coles does not advance a sufficient basis for compassionate release. And moreover, this Court must consider all pertinent

circumstances, including the 3553(a) factors, and possible danger to the community, all o

which also militates against relief. *See United States v. Doe*, -- F. App'x --, 2020 WL

6328203 (3d Cir. Oct. 29, 2020) (per curiam; not precedential) (summarily affirming the

denial of compassionate release, in a case in which the defendant presented medical risk,

upon holding that the district court did not abuse its discretion in considering the nature

of the offense, the defendant's history, and the status of the virus at the facility); *United

States v. Bullock*, -- F. App'x --, 2021 WL 285460 (3d Cir. Jan. 28, 2021) (not

precedential) (granting motion for summary affirmance of denial of compassionate

release, as the district court did not abuse its discretion in denying relief for medically

vulnerable inmate upon considering the 3553(a) factors, including the substantial time

remaining to be served on the sentence, and the defendant's criminal history and

institutional infractions).

At present, the defendant's medical conditions are appropriately managed at the

facility, which is also engaged in strenuous efforts to protect inmates against the spread

of COVID-19, and also acts to treat any inmate who does contract COVID-19.

Moreover, he continues to present a danger to the community, and should be

required to serve the sentence that this Court imposed for his criminal conduct. The

defendant engaged in two separate conspiracies to obtain kilogram level quantities of

cocaine. He did this notwithstanding having eight prior convictions, including corrupting

the morals of a child and two felony drug convictions. In addition to his two prior felony

drug offenses, the defendant has a felony conviction for carrying a concealed weapon in

Delaware that resulted in someone being shot. PSR ¶ 116. Here, notwithstanding two

felony drug convictions, the defendant conspired with others to obtain kilograms of cocaine that were destined for the City of Chester. There is no doubt that at the time of his offense, the defendant was engaging in prohibited conduct that presented a significant danger to the community.

The defendant fails to demonstrate how release, 87 months into a 240-month sentence for a serious drug crime, reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). A consideration of the factors above shows that release at this point is inappropriate based on the offense of conviction, the defendant's managed medical condition, and the amount of time remaining on the defendant's sentence. Of note, in this case, the Court granted a significant downward variance from the guideline range that was 360 months to life. PSR ¶ 164. Given that the Court varied downward significantly when it imposed sentence, the government would respectfully request that the Court deny the defendant's motion which would result in release 87 months in to a 240-month sentence.

To date, courts have generally granted compassionate release where the inmate suffers from significant ailments that specifically raise the risk of an adverse outcome from COVID-19, is serving a short sentence or has served most of a lengthier one, does not present a danger to the community, and/or is held at a facility where a notable outbreak has occurred. A court recently accurately summarized: "The common features of the recent cases where inmates have been granted judicial relief on motions for compassionate release due to the pandemic are either (1) properly exhausted claims that

unreasonably were refused despite the existence of severe, chronic, or terminal conditions that could warrant release even in the absence of a pandemic, or (2) in cases where the defendants had severe medical conditions that placed them at high risk of coronavirus complications, were housed at a facility with confirmed cases, and had served a large majority of their sentences." *United States v. Ball*, 2020 WL 4816197, at *6 (E.D. Mich. Aug. 19, 2020). *See, e.g.*, *United States v. Rodriguez*, 2020 WL 1627331, at *7 (E.D. Pa. Apr. 1, 2020) (Brody, J.) (release granted where defendant is vulnerable due to Type 2 diabetes mellitus with diabetic neuropathy, essential hypertension, obesity, and "abnormal liver enzymes in a pattern most consistent with non-alcoholic fatty liver disease," has only one year left on 20-year sentence for nonviolent drug offense, and has exhibited good behavior); *United States v. Nunez*, 2020 WL 5237272, at *7 (E.D. Pa. Sept. 1, 2020) (Sanchez, C.J.) (release granted after 47 months of a 72-month term for drug and firearm offenses, "because Nunez presents a unique case in which he provided substantial assistance to authorities, shows significant rehabilitation, and faces an increased risk of severe illness" from obesity, tuberculosis, and gout); *United States v. Gutman*, 2020 WL 2467435 (D. Md. May 13, 2020) (56-year-old has hypertension and multiple sclerosis; has served four months of six-month sentence for nonviolent offense).

Courts have generally denied release in circumstances comparable to those presented here. *United States v. Ruffin*, 978 F.3d 1000, 1008–09 (6th Cir. 2020) (defendant has served 10 years of 25-year term for drug and witness tampering offenses; suffers from a blood disorder that caused strokes and partial paralysis, as well as "heart problems, high blood pressure, high cholesterol, and blood clots"; the district court did

not abuse its discretion in denying relief, based on the fact that the defendant had not served half his sentence, the original sentence included a 5-year downward variance, he committed serious offenses while suffering from the same conditions, and he had a record of drug and weapons offenses); *United States v. Ramos*, 2020 WL 6193915 (E.D. Pa. Oct. 20, 2020) (Leeson, J.) (relief is denied where defendant has served less than half of a 151-month term for methamphetamine offenses, given the severity of the offenses, the fact that the defendant only presents mild asthma, and he has a long history of drug and other offenses); *United States v. Goode*, 2020 WL 6445930, at *6 (E.D. Pa. Nov. 2, 2020) (Kenney, J.) (notwithstanding health conditions, release is not warranted with 55 months remaining on 210-month sentence for career offender who committed drug trafficking offenses); *United States v. Hall*, 2020 WL 6822948 (E.D. Pa. Nov. 19, 2020) (Bartle, J.) (the defendant's medical conditions do not justify release; in addition, release after 170 months of a 280-month sentence is inappropriate because he was a career offender who committed an offense involving three kilograms of cocaine possessed near a school); *United States v. Robinson*, 2020 WL 7056488 (E.D. Pa. Dec. 2, 2020) (Beetlestone, J.) (denied notwithstanding obesity (BMI of 40.4) and prediabetes, as defendant is 37, health is cared for, institution has few cases, and "releasing Robinson after fifty-seven months [of 120-month term] would fail to reflect the seriousness of conspiring to sell and personally distributing large quantities of PCP in a residential community, near a daycare and a university," and would cause unwarranted sentence disparities); *United States v. Morales-Ortiz*, 2021 WL 65477, at *5 (E.D. Pa. Jan. 7, 2021) (Pratter, J.) (relief is denied for 61-year-old notwithstanding mild obesity (30.1) and hypertension; release after 139

months of 180-month sentence would not align with the 3553(a) factors, as he "possessed a significant amount of methamphetamine, cocaine, a digital scale, two firearms, and over 90 rounds of ammunition. . . . To be sure, this dangerous conduct took place almost ten years ago, but Mr. Morales-Ortiz was a mature adult at the time and was experiencing some of the same conditions he presents today, albeit with a slightly lower BMI—28.9 at the time of his sentencing."); *United States v. Estrada*, 2021 WL 308271 (E.D. Pa. Jan. 29, 2021) (Joyner, J.) (release is not warranted where 74-year-old suffers from a variety of ailments, but none is a definite risk factor, and he has served less than 60% of a 188-month term for heroin trafficking offenses); *United States v. Hilario*, 2021 WL 322899, at *3 (E.D. Pa. Feb. 1, 2021) (Schmehl, J.) (BMI of 32.2 for 33-year-old is not sufficient, and in any event, he committed serious drug offenses after prior convictions for the same conduct, and has served only 35 months of the 96-month term); *United States v. Hogan*, 2020 WL 4347378, at *4 (M.D. Pa. July 29, 2020) (inmate suffers from severe obesity and sarcoidosis, but has a long criminal history and 10 years remaining on a 16.5-year drug trafficking sentence, which was itself the product of a downward variance); *United States v. Ikehara*, 2020 WL 3065104 (D. Haw. June 9, 2020) (defendant has 39 months remaining on 100-month drug sentence, and has lengthy criminal record for myriad offenses; relief is therefore denied notwithstanding coronary artery disease, heart disease, hypertension, hyperlipidemia, and Type II diabetes); *United States v. Mathews*, 2020 WL 3498100, at *2 (E.D. Mich. June 29, 2020) ("Drug-related offenses are serious and Defendant has only served 40% of his 151-month sentence."); *United States v. Knight*,

2020 WL 3055987 (E.D. Mich. June 9, 2020) (Elkton inmate is obese, but engaged in drug trafficking and possessed an AK-47, and has served only one-third of his sentence).

In sum, upon consideration of all pertinent factors, the motion for compassionate release should be denied.

Respectfully yours,

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals


*/s Robert E. Eckert*
ROBERT E. ECKERT
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading has been served by first-class mail,

postage prepaid, upon:

Mr. Nathaniel Coles
Reg. No. 71667-066
FCI Ray Brook
P.O. Box 900
Ray Brook, NY  12977

*/s Robert E. Eckert*
ROBERT E. ECKERT
Assistant United States Attorney

Dated:  February 14, 2021.